## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SUSAN STOKER,** *as Administrator of the Estate of Kevin Parks,*<br><br>**Plaintiff,**<br><br>**v.**<br><br>**WEXFORD HEALTH SOURCES, INC., ILLINOIS DEPARTMENT OF CORRECTIONS, GLENN BABICH, DEBORAH ISAACS, DENNIS LARSON, and STACY MENESS,**<br><br>**Defendants.** | **Case No. 25-cv-00661-SPM** |

## <u>MEMORANDUM AND ORDER</u>

**MCGLYNN, District Judge:**

This matter is before the Court on a Motion to Dismiss filed by Defendants Wexford Health Sources, Inc., Dr. Dennis Larson, Stacy Menees, and Dr. Glen Babich pursuant to Federal Rule of Federal Procedure 12(b)(6), and a Motion to Dismiss filed by Defendants the Illinois Department of Corrections and Deborah Isaacs pursuant to Rules 12(b)(1) and (6). (Docs. 23, 38). Plaintiff opposes the Motions. (Docs. 45, 50). For the following reasons, the Motions are granted in part and denied in part.

### ALLEGATIONS IN THE COMPLAINT

Plaintiff Susan Stoker, Administrator of the Estate of Kevin Parks, commenced this action on April 17, 2025, claiming constitutional violations pursuant to 42 U.S.C. § 1983 and violations of Illinois state laws, the Americans with Disabilities Act, and the Rehabilitation Act. (Doc. 1). In considering a motion to dismiss, the Court accepts as true the following well-pleaded allegations

of the Complaint. *See Lett v. City of Chi.*, 946 F. 3d 398, 399 (7th Cir. 2020).

Keven Parks (Parks) was diagnosed with autoimmune hepatitis when he was 14 years old. (*Id.* at p. 4). Autoimmune hepatitis occurs when the body's immune system, which usually attacks viruses, bacteria, and other causes of disease, mistakenly targets the liver. If left untreated, autoimmune hepatitis can lead to liver failure and cirrhosis. (*Id.*).

Parks entered the custody of the Illinois Department of Corrections (IDOC) in 2019. (Doc. 1, p. 4). While at IDOC's Northern Reception and Classification Center, Parks was called to the healthcare unit for abnormally elevated Liver Function Tests (LFT's). Parks informed the Northern Reception physician assistant, Claude Owikotipn, that he had been diagnosed with an autoimmune condition and had been receiving prescribed medications for his condition while at Kane County Jail. PA Owikotipn ordered repeat LFT's in four weeks and instructed Parks to avoid hepatotoxic substances. Medical providers at Northern Reception, however, never followed up regarding Parks' abnormal blood tests, never ordered follow-up LFT's, and never requested information from Kane County Jail regarding Parks' autoimmune condition or medication history. Parks was not placed on any medication to treat his autoimmune cirrhosis while at Northern Reception. (*Id.*).

On December 14, 2021, Parks was transferred to Big Muddy River Correctional Center (Big Muddy). (Doc. 1, p. 5). An LPN noted that Parks' medical chart was reviewed upon his arrival, but medical staff failed to note anything about Parks' elevated LFT's or autoimmune disease on his medical intake form. (*Id.*).

On December 29, 2021, Parks reported to the healthcare unit with constipation, indigestion, and abdominal tenderness. (Doc. 1, p. 5). He described the pain as "excruciating." Defendant Dr. Dennis Larson, a physician at Big Muddy, sent Parks to Good Samaritan Hospital. The medical providers at Good Samaritan Hospital documented Parks' history of autoimmune hepatitis and

recommended treatment. Further testing showed that significant damage had already been done due to the lapses in Parks' care. Parks' liver showed signs of cirrhosis with ascites. Parks was discharged from the hospital and returned to Big Muddy on January 1, 2022. The discharging physician noted that it was important that Parks: (1) see a liver doctor to follow up with his autoimmune hepatitis; and (2) report to a transplant surgery clinic to be evaluated for a liver transplant. (*Id.*).

Parks was seen by Uchenna Agbim, a hepatologist and gastroenterologist at Saint Luis University Hospital (SLU) on February 17, 2022. (Doc. 1, p. 5). Dr. Agbim noted that Parks' autoimmune hepatitis had "progressed due to inconsistent/lack of treatment." She further noted that because Parks was "not a transplant candidate currently given that he is currently institutionalized, it is important for us to try to halt further disease activity." Because Parks had already proved intolerant to various medications, this meant relying on second-line treatment options. Dr. Agbim also indicated that Parks needed a low salt diet and a vaccination for Hepatitis A. (*Id.*).

Plaintiff asserts that SLU's policy of denying transplants to incarcerated individuals stemmed from Defendant Wexford Health Sources, Inc.'s (Wexford) proven inability or unwillingness to provide adequate medical care to the people in its custody. (Doc. 1, p. 6). Furthermore, IDOC and Wexford knew that SLU had a policy of denying transplants to incarcerated people. Despite its awareness of this self-created problem, IDOC and Wexford continued—and continue—to send individuals in need of transplants to an institution that they know will not provide them. Upon learning that his patient needed a transplant, Dr. Larson took no action to have Parks seen or evaluated by any of the hospitals that IDOC and Wexford know provide transplants to incarcerated individuals. Faxes from SLU went unanswered, Parks did not

receive a vaccination for Hepatitis A, and Defendants did not place Parks on a low sodium diet. (*Id.*).

Parks continued to report abdominal pain and bloating. (Doc. 1, p. 6). Under the false impression that Parks could only receive a liver transplant if he were released, Parks and his mother collected medical records in hopes of filing for medical release under the Joe Coleman Medical Release Act. Defendant Deborah Isaacs, the health care unit administrator at Big Muddy, was notified of Parks' desire for medical release and the reasons behind it, but she took no action to have Parks evaluated for a transplant at any of the hospitals IDOC and Wexford know provide transplants to incarcerated patients. (*Id.*).

Parks' health continued to decline. (Doc. 1, p. 6). On May 20, 2022, he vomited so violently that his nose began to bleed. He reported being nauseous every day. In July 2022, Parks visited the healthcare unit with groin discomfort, and he lost ten pounds in two months. (*Id.*). Defendant Stacy Menees, a nurse practitioner at Big Muddy, documented Parks' symptoms but took no steps to have him referred to a hospital where incarcerated individuals can receive transplants. (*Id.* at p. 6-7). Although she received Dr. Agbim's notes, NP Menees failed to vaccinate Parks for Hepatitis A or place him on a low sodium diet. (*Id.* at p. 7).

In September 2022, Parks informed Dr. Agbim that he still had not been vaccinated for Hepatitis A and that the medications he was receiving at Big Muddy were expired. (Doc. 1, p. 7). Dr. Agbim implored Dr. Larson to have Parks vaccinated and placed on a low sodium diet. Neither recommendation was noted in Parks' medical records. On October 8, 2022, Parks presented at the healthcare unit feverish and guarding his stomach. For two days, he experienced abdominal pain that radiated into his back. Defendant Dr. Glenn Babich, the regional medical director for Wexford, was informed of the situation and instructed that Parks be sent to Good Samaritan Hospital.

Plaintiff asserts that Dr. Babich knew that he was not receiving—and would never receive—the life-saving treatment he required from SLU. Dr. Babich also knew that other hospitals in the region evaluate incarcerated individuals for transplants. Even so, Dr. Babich took no steps to ensure that Parks received the necessary care. (*Id.*).

At Good Samaritan Hospital, Parks was diagnosed with a blood infection and a stool infection, requiring four weeks of intravenous antibiotic treatment. (Doc. 1, p. 7). Parks was discharged back to Big Muddy. At Big Muddy, Parks was seen by Dr. Larson on October 20, 2022, and by NP Menees on November 1, 2022. (Doc. 1, p. 7-8). There is no indication that Dr. Larson or NP Menees discussed Parks' treatment plan with him, his diet, or the importance of medication compliance. (*Id.*).

Plaintiff saw Dr. Agbim on December 10, 2022. (Doc. 1, p. 8). In her medical notes, Dr. Agbim indicated that she and Parks discussed her "concern that we have exhausted many medications for treatment and that he does not have a backup of [Orthotopic Liver Transplantation] if his liver gets worse." Dr. Agbim continued: "While he has indications for [Orthotopic Liver Transplantation] currently, he cannot do so given that he is institutionalized." (*Id.*).

On December 30, 2022, Parks informed Dr. Larson that he would refuse his medications in hope that such refusal would allow him to be transferred to a different facility so that he would be eligible for work release and, potentially, a transplant. (Doc. 1, p. 8). Dr. Larson told Parks that he should discuss his plan with Dr. Agbim at his next appointment. Dr. Larson did not educate Parks on the importance of medication compliance or inform him that he could be eligible for a transplant while incarcerated at Big Muddy if only he were referred to a different hospital. On January 7, 2023, Parks complained to Big Muddy staff that they were giving him the wrong doses

of his liver medications. Rather than giving him 1,000 milligrams per day, as prescribed by Dr. Agbim, they gave him 2,000 milligrams per day. (*Id.*).

Parks was treated at the healthcare unit by NP Menees on February 10, 2023, and again on February 14, 2023, for increasing abdominal pain and diarrhea up to ten times per day. (Doc. 1, p. 9). NP Menees called Dr. Agbim's office for advice. Dr. Agbim suggested various medications and again recommended that Parks be placed on a low-sodium diet. NP Menees sent Parks back to Good Samaritan Hospital. The treating doctors recommended that Parks see a hepatologist "as soon as possible." Once discharged from the hospital, Parks was placed back into general population at Big Muddy. (*Id.*).

On February 16, 2023, Parks returned to the healthcare unit after vomiting "blood-tinged vomit that was 'dark brown.'" (Doc. 1, p. 9). He reported decreased urination and 10 out of 10 abdominal pain. NP Menees noted that Parks' abdomen was distended and sent him to the emergency room. Again, the doctors documented increasing fluid build-up, indicating a progression of Parks' liver disease. (*Id.*).

Parks saw Dr. Agbim on February 23, 2023. (Doc. 1, p. 9). Dr. Agbim's treatment notes reiterated that "we have exhausted many medications for treatment and [Kevin] does not have a backup of [Orthotopic Liver Transplantation] if his liver gets worse." Defendants received these medical notes and again declined to inform Parks of his treatment options or to seek care from a hospital where they knew incarcerated individuals would be considered for liver transplantation. (*Id.* at p. 9-10).

Parks returned to the healthcare unit on February 27, 2023, with abdominal pain and a swollen and distended abdomen. (Doc. 1, p. 10). Dr. Larson sent Parks back to the emergency department at Good Samaritan Hospital. The medical providers noted that (1) Parks likely needed

a liver transplant; (2) he needed a low sodium diet; (3) his cirrhosis had continued to progress; and (4) they were concerned about poor blood flow in the cells around his liver. The medical providers also informed Parks that he "will need to be on a prophylactic antibiotic called Ciprofloxacin until you get a liver transplant." Parks was discharged from the hospital on March 10, 2023. (*Id.*).

The following day, Big Muddy sent Plaintiff back to the emergency room. (Doc. 1, p. 10). Parks' Model for End-Stage Liver Disease (MELD) score had skyrocketed to 30, indicating an urgent need for a liver transplant. Plaintiff's cirrhosis was described as "decompensated," and doctors suspected septicemia. (*Id.*).

On March 30, 2023, Dr. Agbim wrote a letter to Parks' mother, Gladys. (Doc. 1, p. 10). She informed Gladys that Parks had "gone untreated for most of his time in prison and his autoimmune hepatitis [had] resulted in the development of end-stage liver disease called cirrhosis." She informed Gladys that Parks' chronic kidney disease had also progressed such that "[i]n the past 6 months, he has had multiple admissions to the hospital for an infection in his blood, recurrent ascites, low blood pressure, and worsening kidney function." Dr. Agbim wrote that she believed Parks had "a high chance of death in the next year." (*Id.*).

On April 4, 2023, Plaintiff was sent to SLU. (Doc. 1, p. 11). He was "critically ill with anasarca," a severe condition that causes widespread swelling throughout the entire body. The hospital began palliative care. Parks' mother, Gladys, requested to visit him before he died. Big Muddy denied the request. Parks died on April 23, 2023. (*Id.*).

Plaintiff asserts the followings counts:

**Count 1:**   Eighth Amendment deliberate indifference claim against Babich, Isaacs, Larson, and Menees.

**Count 2:**   Eighth Amendment deliberate indifference (*Monell*) claim against Wexford.

**Count 3:**      Civil conspiracy claim under Section 1983 against Babich, Isaacs, Larson, and Menees.

**Count 4:**      Eighth Amendment failure to intervene claim against Babich, Isaacs, Larson, and Menees.

**Count 5:**      State law negligence claim against Wexford, Babich, Isaacs, Larson, and Menees.

**Count 6:**      State law wrongful death claim against Wexford, Babich, Isaacs, Larson, and Menees.

**Count 7:**      Americans with Disabilities Act claim against IDOC.

**Count 8:**      Rehabilitation Act claim against IDOC.

**Count 9:**      Illinois Survival Act claim against Wexford, Babich, Isaacs, Larson, and Menees.

**Count 10:**     Respondeat Superior claim against Wexford.

Defendants have filed Motions to Dismiss. (Docs. 23, 38). Plaintiff opposes the Motions (Docs. 45, 50).

**MOTION TO DISMISS**

### I.      Legal Standard

Defendants Wexford, Dr. Larson, NP Menees, and Dr. Babich have filed their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and Defendants Isaacs and IDOC have filed their Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6). (Docs. 23, 28). Rule 12(b)(1) permits the dismissal of any claim over which a federal court lacks subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). While the purpose of a motion to dismiss filed pursuant to Rule 12(b)(6) is to decide the adequacy of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). Under both rules, the Court is to construe the Complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); *Alicea-*

*Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 701 (7th Cir. 2003).

## II.    Sovereign Immunity – Defendant Isaacs (Counts 5, 6, 9)

Defendant Isaacs argues that Plaintiff's state law claims against her, Counts 5, 6, and 9, should be dismissed as barred by the Illinois doctrine of sovereign immunity. (Doc. 38, p. 17). The Court agrees.

When a federal court is exercising supplemental jurisdiction over claims based on state law, the court must apply state law immunities. *Rodriguez v. Cook Cnty.*, 664 F.3d 627, 631 (7th Cir. 2011). The Illinois State Lawsuit Immunity Act, 745 Ill. Comp. Stat. 5/1, provides that the State of Illinois is immune from suit in any court, except as provided in the Illinois Court of Claims Act, 705 Ill. Comp. Stat. 505/8 (and other statutes not relevant here), which vests jurisdiction over state tort claims against the state in the Illinois Court of Claims." *Richman v. Sheahan,* 270 F.3d 430, 441 (7th Cir. 2001). Accordingly, when sovereign immunity applies, this Court lacks jurisdiction to hear the claim—just as the Illinois trial court would. *Walker v. Rogers*, 650 N.E.2d 272, 273-74 (Ill. App. Ct. 1995).

"Under Illinois law, a claim against individual officers will be considered a claim against the state, even when, as here, the officials are sued in their individual capacities, if 'judgment for the plaintiff could operate to control the actions of the State or subject it to liability.'" *Richman,* 270 F.3d at 441 (quoting *Currie v. Lao*, 592 N.E.2d 977, 980 (1992)). A defendant's conduct will be attributed to the state for purposes of sovereign immunity if:

> [T]here are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State[.]

*Ingram v. Ill. Dept. of Corr.* No. 10-933-GPM, 2011 WL 1519623, at *3 (S.D. Ill. 2011) (quoting *Sneed v. Howell*, 716 N.E.2d 336, 340 (Ill. App. Ct. 1999)). Based on these factors, the Court finds that Illinois would consider the negligence, wrongful death, and survival claims against Isaacs to be against the state.

Here, the Complaint does not contain any allegations that Isaacs was acting beyond her authority through wrongful acts. At the time of the alleged negligent conduct, Isaacs was the healthcare unit administrator at Big Muddy, who was "responsible for the implementation, oversight, and supervision of policies and practices at Big Muddy." (Doc. 1, p. 3). Plaintiff asserts that Isaacs acted in "derogation of [her] duty" as the health care unit administrator and was guilty of "professional negligence" by not taking "action to have [Parks] evaluated for a transplant at any of the hospitals the IDOC and Wexford know provide transplants to incarcerated patients." (*Id.* at p. 6, 17). Plaintiff argues in opposition to the application of sovereign immunity by stating that the facts in the Complaint establish that Isaacs was taking "individual actions in the form of refusal to provide Kevin Parks lifesaving medical treatment" that were not influenced by her role in her position at the prison. (Doc. 50, p. 10). Plaintiff's allegations, however, "challenge only the manner in which [Isaacs] carried out [her] official duties, and she does not allege that [Isaacs] did anything that was beyond the scope of [her] authority or that [Isaacs'] actions were outside [her] normal and official functions" in failing to ensure that Parks was evaluated for a transplant or otherwise provided needed medical care. *Ingram*, 2011 WL 1519623, at *3. Her facts as pled do not suggest that Isaacs acted for a purpose unrelated to and beyond the scope of her employment. *Richman*, 270 F.3d at 442.[1]

---

[1] *See also See Branham v. Mengler,* No. 04–2281, 2005 WL 3534223, at *3 (C.D. Ill. Dec. 5, 2005) (allegations that a dean at a state university made false promises of tenure to an associate professor were barred by sovereign immunity where the dean had authority to make statements of the general type alleged and thus was acting within the scope of his authority); *Witt v. Correctional Officer Andrew,* No. 99 C 2866, 2000 WL 1349246, at *2–3 (N.D. Ill. Sept.19,

Furthermore, according to the Complaint, Isaacs breached a duty that was uniquely held by her because of her position as the health care unit administrator at Big Muddy. She had the opportunity to assist Parks in obtaining proper medical care, including a transplant evaluation, solely because of her position as an IDOC employee. As the Illinois Supreme Court has held, "[w]here a charged act of negligence arose out of the State employee's breach of a duty that is imposed on him solely by virtue of his State employment, sovereign immunity will bar maintenance of the action in any court." *Turner v. Miller,* 301 F.3d 599, 602 (7th Cir. 2002) (quoting *Currie v. Lao,* 592 N.E.2d 977, 980 (1992)). The relationship between Isaacs and Parks would not have had a source outside Isaacs' employment status, and "whatever duty was owed by [Isaacs] to [Parks] existed because of [Parks'] status as a prisoner and his presence at [Big Muddy]. *Turner,* 301 F.3d at 602-603.

For these reasons, the Court finds that Plaintiff's state law claims against Isaac are actually against the State of Illinois, and the claims are barred by sovereign immunity. Therefore, the Court lacks subject matter jurisdiction, and Claims 5, 6, and 9 are dismissed as to Isaacs. FED. R. CIV. P. 12(b)(1).

### III.    Statute of Limitations

#### a. Section 1983 Claims – Defendants Dr. Babich, Dr. Larson, NP Menees, Wexford, and Isaacs (Counts 1, 2, 3, 4)

The parties agree that the applicable statute of limitations for Section 1983 claims arising in Illinois is two years. *See Woods v. Ill. Dep't of Children and Family Servs.*, 710 F.3d 762, 766

---

2000) ("The court cannot imagine any set of conceivable facts where Andrew's negligent discharge of his shotgun while he was on duty as an armed guard in the prison could be considered outside the scope of the duties imposed upon him by his state employment."); *Healy v. Vaupel,* 549 N.E.2d 1240, 1247–48 (Ill. 1990) (allegations that athletic directors at a state university negligently failed properly to supervise or train employees, failed to supervise the training and conditioning techniques of gymnasts, including the plaintiff, negligently hired employees of the university's athletic department, failed properly to supervise the rehabilitation of injured athletes, and failed to warn the plaintiff of the dangerous nature of the gymnastic activities the plaintiff was directed to perform concerned matters within the scope of the defendants' authority).

(7th Cir. 2013). The issue here is when the two-year period began to run.

The Seventh Circuit has held that a Section 1983 deliberate indifference medical injury claim accrues when the plaintiff knows of his physical injury and its cause. *See Devbrow v. Kalu,* 705 F.3d 765, 768 (7th Cir. 2013). Where an ongoing period of inadequate medical treatment is alleged, however, the doctrine of a continuing violation of constitutional rights means that the statute of limitations does not start to run until the last day of the plaintiff's ongoing injury. *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001); *see also Devbrow*, 705 F.3d at 770. The continuing violation doctrine allows a plaintiff to "reach back" to the beginning of the ongoing injury "even if that beginning lies outside the statutory limitations period" because "it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct." *Cesal v. Moats,* 851 F.3d 714, 722 (7th Cir. 2017) (quoting *Heard*, 253 F.3d at 319). "In other words, the continuing-violation doctrine operates to *delay* the start of the limitations period." *Devbrow,* 705 F.3d at 770 (emphasis in original) (quoting *Heard,* 253 F.3d at 319).

Despite Defendants' arguments that the claims against them accrued either on the date they last treated Parks or on the date Parks became aware of his injury, the Court finds that the continuing violation doctrine applies to Plaintiff's claims brought under Section 1983. (*See* Doc. 23, p. 6-8; Doc. 38, p. 5-7). The "injuries about which [Plaintiff] is complaining in this case are the consequence of a numerous and continuous series of events." *Heard,* 253 F.3d at 319. Plaintiff alleges that Parks received inadequate care for his autoimmune hepatitis, which progressed into cirrhosis, since his arrival into IDOC custody in 2019 until his death in 2023. Notably, Plaintiff claims that as Parks' condition worsened it became clear that he needed a liver transplant, but Defendants refused to send him for evaluation or to a hospital that would facilitate a transplant.

(Doc. 6-10, p. 24). The Court agrees with Plaintiff that the Complaint sufficiently alleges that "refusing to secure a transplant evaluation at an eligible facility was ongoing." (Doc. 45, p. 3). Thus, Plaintiff "was not required to sue until after the unlawful conduct ended." *Cesal,* 851 F.3d at 722.

As pled, the date the unlawful conduct ended was Plaintiff's death on August 23, 2023. The facts in the Complaint do not clearly establish that Defendants no longer "had the power to do something about [Parks'] condition," just because Parks was transferred to SLU on August 4, 2023. *See Wilson v. Wexford Health Source, Inc.,* 932 F. 3d 513, 517 (7th Cir. 2019) (quoting *Heard,* 253 F.3d at 318). According to the case law cited to by Defendants, a defendant is considered to no longer have the "power to do something," or in other words "help or harm the inmate," on the date when the defendant resigns or retires from public employment, which is not the case here. *See Heard v. Elyea,* 525 F. App'x 510 (7th Cir. 2013) (the plaintiff's claim accrued when the defendant retired); *Wilson*, 932 F.3d at 517-518 (the plaintiff's claim accrued when the defendant resigned); *Christmas v. Wexford Health Sources, Inc.,* No. 17-cv-1006-SMY-RJD, 2018 WL 784042, at *3 (S.D. Ill. 2018) (plaintiff's claim accrued when the defendant ended employment at Menard Correctional Center). *See also Heard,* 253 F.3d at 318 (the plaintiff's claims accrued when he was released from the jail). Nothing in the Complaint suggests that Defendants left IDOC or Wexford employment prior to Parks' death, were no longer part of Parks' medical care team at Big Muddy once Parks was transferred to SLU, or that once hospitalized Parks was no longer considered in the custody of Big Muddy for the purpose of his state conviction. On the contrary, according to the Complaint, staff at Big Muddy continued to exercise authority over Parks even after he was admitted to SLU on August 4, 2023, and refused to allow Parks' mother to visit. (Doc. 1, p. 11). Thus, if the facts alleged are true, Parks continued to be harmed by Defendants "ongoing inaction,"

even once he was hospitalized for the final time. *See Turley v. Rednour,* 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J., concurring). The Court therefore cannot find that Plaintiff's Section 1983 claims against Defendants Dr. Babich, Dr. Larson, Ms. Menees, and Isaacs are "indisputably time-barred," at the pleading stage. *See Small v. Chao,* 398 F.3d 894, 898 (7th Cir. 2005). *See also Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003) (if there is "any set of facts that if proven would establish a defense to the statute of limitations," the motion to dismiss should be denied on those grounds). And likewise, the Court will not dismiss the *Monell* claim against Wexford based on care provided to Parks that began upon his admittance at Northern Reception. *See Prince v. Garcia,* No. 22-cv-05703, 2024 WL 4368130, at *8 (N.D. Ill. 2024) ("the statute of limitations for the underlying Section 1983 claim also applies to the *Monell* claim") (citations omitted). Accordingly, the Court finds that the Motions to Dismiss are denied as to Plaintiff's Section 1983 claims based on the statute of limitations.

**b. State Law Claims – Defendants Dr. Babich, Dr. Larson, NP Menees, and Wexford (Counts 5, 6, and 9)[2]**

Defendants Dr. Babich, Dr. Larson, NP Menees, and Wexford argue that there are no allegations that they treated Parks after he was transferred to SLU on April 4, 2023. (Doc. 23, p. 5). Thus, at the latest, they believe the statute of limitations began to run on Plaintiff's state law claims on April 4, 2023, and Plaintiff's negligence, wrongful death, and survival action claims expired on April 4, 2025, prior to the initiation of this lawsuit. (*Id.*). In the alternative, Defendants argue that the statute of limitations began to run earlier than August 4, 2023, on the last date each individual treated Parks – for Dr. Babich that would be October 8, 2022, Dr. Larson February 26, 2023, and NP Menees February 16, 2023. (*Id.* at p. 6). They conclude that because Plaintiff did

---

[2] Because the Court has found that sovereign immunity bars Plaintiff's state law claims against Isaacs, the Court will not address arguments raised by Isaacs concerning the statute of limitations for claims brought pursuant to Illinois state law.

not file the Complaint until April 17, 2025, under either calculation, the state law claims in this case are time barred and must be dismissed. (*Id.* at 5-6).

As mentioned above, the statute of limitations for Plaintiff's state law personal injury claims is two years. *See* 735 ILCS 5/13-212. "As a general rule, a cause of action for personal injury accrues at the time plaintiff suffers injury." *Wilson v. Devonshire Realty of Danville,* 718 N.E.2d 700, 805 (Ill. App. Ct. 1999) (internal citations omitted). However, equitable exceptions to this principle exist. *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 285 (Ill. 2003). Like the federal system, Illinois has to the continuing tort doctrine which provides, "where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 770 N.E.2d 177, 345 (Ill. 2002). In contrast, pursuant to the discovery rule, the commencement of the relevant statute of limitations is postponed "until the injured plaintiff knows or reasonably should know she has been injured and her injury may have been wrongfully caused." *Wilson,* 718 N.E.2d at 805 (citing *Jackson Jodran, Inc. v. Leydig, Voit & Mayer,* 633 N.E.2d 627, 630-31 (Ill. 1994)). In order to bring a claim under the Illinois Wrongful Death Act, "courts have held that 'a wrongful death action will only lie where the deceased had a claim that was not time-barred on or before his death.'" *Bass v. Honeywell Int'l, Inc.,* No. 23-cv-2-SMY, 2024 WL 2700670, at* (S.D. Ill. 2024) (quoting *Beetle v. Wal-Mart Assocs., Inc.*, 761 N.E.2d 364, 369 (2001)).

For the same reasons previously discussed, the Plaintiff has sufficiently pled facts establishing that Parks was subjected to "a continuous and unbroken course of negligent treatment," and "that the treatment was so related as to constitute one continuing wrong." *Cunningham v. Huffman,* 609 N.E.2d 321, 325 (Ill. 1993). Plaintiff does not allege "malpractice on the basis of one single failure" on the part of Defendants. *Myles v. Mercy Hospital,* No. 15 C

8804, 2016 WL 3752983, at *5 (N.D. Ill. July 14, 2016). Rather, she claims that since Parks' arrival at Northern Reception in 2019 until his death, he received negligent care by Wexford medical staff. From 2019 until December 2021, his autoimmune condition was not treated at all, and then, once at Big Muddy, he received inadequate care for his deteriorating health and was never referred for a transplant evaluation. Accepting the allegations in the Complaint as true and drawing inferences in Plaintiff's favor, it is not plainly apparent that Plaintiff's state law claims against Defendants Wexford, Dr. Babich, Dr. Larson, and NP Menees are barred by the statute of limitations. Defendants' Motion to Dismiss Counts 5, 6, and 9 as barred by the statute of limitations is denied.

### IV. Failure to State a Claim

#### a. The Americans with Disabilities Act and the Rehabilitation Act– Defendant IDOC (Counts 7 and 8)

The Court agrees with Defendant IDOC that Plaintiff has failed to state a claim under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).

Under the ADA, "no qualified individual with a disability shall, by reason of such disability…be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006). The RA likewise prohibits discrimination against qualified individuals based on physical or mental disability. *See* 29 U.S.C. §§ 794-94e. The analysis under the ADA and the RA is the same, except that the RA includes as an additional requirement the receipt of federal funds, which all states accept for their prisons. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) (citing 29 U.S.C. § 705(2)(B)). Discrimination under both includes failure to accommodate a disability. *Jaros*, 684 F.3d at 672 (citation omitted).

The Court finds that, as pled, Plaintiff's allegations are inappropriately framed under the

ADA and the RA. In the Complaint, Plaintiff asserts that IDOC failed to reasonably accommodate Parks' disability, liver cirrhosis, and discriminated against him by denying him access to medical services and any transplant program. (Doc. 1, p. 20-21). The Court finds that this wording "does not transform Plaintiff's complaint about the quality and extent of his access to medical care into a disability discrimination claim." *Rosado v. Alameida,* No. Civ.03CV1110J (LSP), 2005 WL 892120, at *3 (S.D. Cal. Feb. 8, 2005) (finding that the plaintiff failed to state a claim under the ADA where the plaintiff alleged that the department of corrections failed to make reasonable accommodations for his disability by failing to have him evaluated for a liver transplant, failing to place him on the liver transplant list, and by failing to modify his diet as recommended by his physician). The ADA and RA do not create a "federal cause of action for prisoners challenging the medical treatment provided for their underlying disabilities." *Hubbard v. Taylor,* 452 F.Supp.2d 533, 544 (D. Del. Sept. 20, 2006) (citing *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121–22 (7th Cir.1997)). Nor are the ADA and RA "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996). "The benefits and services [Parks wished] to receive [were] *for* his disability; it is illogical to say that he [was] being denied medical services because he [had] a disability." *Rosado,* 2005 WL 892120, at *3. There is no indication that Parks was subject to discrimination or that he failed to receive services that other inmates received. *See Estate of Crandall v. Godinez*, No. 14-CV-1401, 2015 WL 1539017, at *7 (C.D. Ill. Mar. 31, 2015) (claim "that [plaintiff, a mentally ill inmate who committed suicide] was not properly treated for his mental illness—is distinctly different from a claim that [plaintiff] was denied access to medical services, and is not cognizable under the ADA."). Thus, Plaintiff has failed to state a claim under the ADA and RA and Counts 7

and 8 are dismissed without prejudice.[3]

### b. Deliberate Indifference/Failure to Intervene – Defendants Dr. Babich, Dr. Larson, NP Menees, and Isaacs (Counts 1 and 4)

Defendants Dr. Babich, Dr. Larson, and NP Menees argue that Plaintiff has failed to state a claim against them for deliberate indifference. (Doc. 23, p. 8-11). They point out that there are no assertions that they failed to diagnose Parks or that they denied the recommendations of outside providers when treating him. (*Id.* at p. 9). They argue that Plaintiff is attempting to hold them liable for Dr. Agbim's treatment decisions, for IDOC's choice of treatment facility, and because they did not obtain a second opinion to assess Parks' transplant candidacy – none of which states a claim under the Eighth Amendment. (*Id.* at p. 9-10). Defendants state that according to Plaintiff, Parks was transferred to different hospitals and seen by specialists over the course of more than a year, and they cannot be held deliberately indifferent for sending Parks to the emergency rooms when required. (*Id.* at p. 10). They also assert that Plaintiff has failed to assert a failure to intervene claim, as she has not specified what constitutional violations Defendants should have stopped or what realistic opportunities existed to each Defendant to intervene. (*Id.* at p. 14).

Healthcare Unit Administrator Isaacs also argues that Plaintiff has failed to sufficiently plead a deliberate indifference or a failure to intervene claim against her. (Doc. 38, p. 14-15). She states that the Complaint is absent of facts showing her personal involvement in the alleged deprivation of Parks' constitutional rights. (*Id.*). Isaacs asserts that the only allegation against her is that she was the healthcare unit administrator at Big Muddy during the relevant times, and she was notified of Parks' "desire for medical release and the reasons behind it" but "took no action." (*Id.* at p. 15 (citing Doc. 1, p. 6)). She argues that it is insufficient to state a claim for deliberate

---

[3] Because the Court finds that Plaintiff has failed to state a claim under the ADA and RA, the Court will not address Defendant IDOC's statute of limitations arguments. (*See* Doc. 38, p. 8).

indifference by merely alleging inaction. (*Id.* at p. 15, 16). Similarly, Isaacs argues that the Complaint fails to establish that she had a reasonable opportunity to prevent the violation of Parks' constitutional rights. (*Id.* at p. 16). She contends that the failure to intervene claim relies on only a "summary recitation of the legal standard." (*Id.*).

When asserting a deliberate indifference claim, a plaintiff must put forward allegations implicating both an objective and subjective element, namely that: (1) there was an objectively serious medical need; and (2) the prison official acted with deliberate indifference toward that need. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). On the other hand, to state a claim for failure to intervene, a plaintiff must plead that the defendant had a realistic opportunity to prevent another state employee or official from committing a constitutional violation but failed to do so. *See Windle v. City of Marion, Ind.*, 321 F. 3d 658, 663 (7th Cir. 2003). The Court notes that pleading a separate Eighth Amendment violation for failure to intervene is not necessarily redundant of an Eighth Amendment violation for denying or delaying medical care. "A claim for failure to provide medical care concerns the defendant's knowledge of, and disregard for, a serious medical risk; whereas a claim for failure to intervene concerns the defendant's failure to prevent another from committing a constitutional violation." *Awalt v. Marketti,* No. 11 C 6142, 2012 WL 1161500, at *11 (N.D. Ill. Apr. 9, 2012). *See also Winchester v. Marketti,* 2012 WL 2076375, at *6 (N.D. Ill. June 8, 2012) ("Failure to provide medical care stems from the defendant's own personal responsibility to provide care directly to persons. Failure to intervene stems from the defendant's duty to protect persons against the conduct of other[s]. The two may overlap, but they are not commensurate.").

The Court finds that Plaintiff has sufficiently stated claims for deliberate indifference and failure to intervene against Dr. Babich, Dr. Larson, NP Menees, and Isaacs. The federal system of

notice pleading requires only that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This requirement is satisfied if the complaint (1) describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and (2) plausibly suggests that the plaintiff has a right to relief above a speculative level. *Twombly*, 550 U.S. at 555. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *EEOC v. Concentra Health Servs.,* 496 F.3d 773, 776 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). Plaintiff has done so here.

The narrative of the Complaint is that Parks received deficient care for his autoimmune hepatitis and subsequent cirrhosis while in the custody of IDOC, specifically during his time at Big Muddy, which ultimately lead to his death. While Plaintiff had appointments with an outside specialist, Dr. Agbim, Plaintiff asserts that his medical care at Big Muddy was poor and inconsistent. He claims that the recommendations of Dr. Agbim were not followed, he received expired medication and the wrong dosage of medication, he was frequently sent to the emergency room due to his rapidly deteriorating health and inadequate care, he repeatedly was sent back to general population after reporting severe symptoms at the healthcare unit, and he was never seen or evaluated for a liver transplant. According to Plaintiff, Dr. Agbim wrote that Parks had "gone untreated for most of his time in prison." (Doc. 1, p. 10). Plaintiff pleads that Dr. Babich, Dr. Larson, NP Menees, and Isaacs participated in and are responsible for Parks' care and failed to treat or take action that would lead to proper treatment of Parks' condition, including a liver transplant. Additionally, Dr. Babich, Dr. Larson, and NP Menees, as Parks' medical providers, and Isaacs, as the healthcare unit administrator, were in the position and had opportunities to prevent

Parks' from receiving constitutionally deficient care at the hands of others but failed to do so. (*Id.* at p. 16). The extent of each Defendant's role in Parks' medical treatment and whether each Defendant had the opportunity to intervene or the authority "to refer Parks for further care, including a liver transplant evaluation, or whether they were bound by 'administrative issues beyond [their] control' are factual issues to be determined at a later date in the litigation." *Dangerfield v. Wexford Health Sources, Inc.,* No. 23-cv-03687-SPM, 2024 WL 2873809, at *4 (S.D. Ill. June 7, 2024) (quoting *Thomas v. Martija*, 991 F. 3d 763, 770 (7th Cir. 2021)). Thus, the Court will not dismiss Counts 1 and 4 at this stage.

### c. *Monell* Claim – Defendant Wexford (Count 2)

Wexford is a private corporation, and the Seventh Circuit held that the *Monell* theory of municipal liability applies in Section 1983 claims brought against private companies that act under color of state law. *See, e.g., Shields v. Ill. Dep't of Corr*., 746 F.3d 782 (7th Cir. 2014) (noting that every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). "To establish [*Monell*] liability, a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chi.*, 690 F.3d 829, 833–34 (7th Cir. 2012). Typically, a plaintiff establishes an official policy through "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 834 (citation omitted).

Plaintiff has put forth sufficient facts for a deliberate indifference claim to proceed against Wexford. According to the Complaint, for the first two years of his incarceration, Parks did not

receive any treatment for his autoimmune condition, despite informing medical staff about his diagnosis and having test results showing abnormally elevated LFT's. (Doc. 1, p. 4). Plaintiff alleges that it was not until Parks needed emergent care and was taken to the emergency room on December 29, 2021, that Parks even started receiving care from medical providers within IDOC. (*Id.* at p. 5). After this point, the Complaint describes Parks' physical health steadily decreasing, worsening symptoms, and a continued pattern of inconsistent care. Plaintiff attributes Parks' poor health and lapses in care to healthcare personnel's routine failure to: (1) respond or follow up on complaints by prisoners about their health status; (2) review relevant medical records as part of a patient's treatment plan; (3) create a sensible treatment plan for patients whose health status require the creation of a treatment plan; (4) schedule follow-up appointments deemed appropriate by members of the medical staff; (5) take action to secure continuity of care among correctional facilities within IDOC and other healthcare providers; (6) arrange for prisoners to be referred for specialty evaluation or treatment, even when such a referral is necessary or proper; and (7) refer individuals in need of organ transplants to hospitals that do not provide transplants to incarcerated individuals. (Doc. 1, p. 13). Plaintiff states that these routine failures or practices were allowed to flourish because, not only were healthcare personnel inadequately staffed, but Wexford "directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct." (*Id.* at p. 14).

Additionally, Plaintiff states that these policies and practices impacted other inmates within IDOC. (Doc. 1, p. 13). Plaintiff asserts the following:

> It is common within the IDOC to see prisoners with clear symptoms of serious
> medical needs whose medical records reflect an obvious need for treatment and
> whose medical treatment is routinely delayed or completely ignored by healthcare
> and correctional employees. Despite knowledge of these problematic policies and

practices, Defendant Wexford did nothing to ensure that prisoners in IDOC received adequate medical care and access to medical care, thereby acting with deliberate indifference.

(*Id.*). And finally, Plaintiff repeatedly alleges that Wexford failed to have Parks evaluated for a liver transplant and continued to have Parks treated at a hospital that denied incarcerated people transplants. These facts provide enough information to establish a plausible inference that the deficiencies in the care that Parks experienced were the result of a Wexford "widespread custom or practice of treating inmates' medical needs with deliberate indifference." *Ford v. Wexford Health Sources, Inc.,* No. 12 C 4558, 2013 WL 74494, at *9 (N.D. Ill. Feb. 7, 2013). And as this Court has previously noted, contrary to Wexford's assertion, "staffing vacancies, failing to create a sensible treatment plan for patients, and other insufficiencies in prisoner care including 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' *can* amount to deliberate indifference." *Dangerfield v. Wexford Health Sources, Inc.,* 2024 WL 2873809, at *5 (S.D. Ill. June 7, 2024) (quoting *Wellman v. Faulkner,* 715 F. 2d 269, 272 (7th Cir. 1983)). Accordingly, the Court will not dismiss Count 2 against Wexford.

### d. Civil Conspiracy under Section 1983 – Defendant Dr. Babich, Dr. Larson, NP Menees, and Isaacs (Count 3)

Civil conspiracy claims are cognizable under Section 1983. *See Lewis v. Washington,* 300 F.3d 829, 831 (7th Cir. 2002). To state a civil conspiracy claim, "the plaintiff must [plead facts sufficient to] show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

Plaintiff refutes the arguments that she has insufficiently pled a conspiracy claim by stating that the "policy of all Defendants of intentionally sending inmates, such as Kevin Parks, to hospitals that purposefully didn't give liver transplants to inmates is well pled throughout the

complaint," and that "[i]t is well pled that Defendant Isaacs along with all other Defendants reached an agreement to deprive Kevin Parks of his rights by fulfilling this policy and by denying him life saving medical treatment in the form of a liver transplant at a hospital that gave them." (Doc. 50, p. 8).[4]

The Cout finds, however, that it is not well pled that the Defendants reached an expressed or implied agreement to deprive Parks of his constitutional rights. *See Scherer v. Balkema,* 840 F. 2d 437, 441 (7th Cir. 1988) (to establish a prima facie case for civil conspiracy a plaintiff must show "an express or implied agreement among defendants"). In the Complaint, Plaintiff restates only the elements of the conspiracy claim, and she does not provide any factual allegations suggesting a "meeting of the minds." *Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1206 (7th Cir. 1980) (quoting *Sparkman v. McFarlin,* 601 F.2d 261, 268 (7th Cir. 1979)). Although none of the Defendants referred Parks to a hospital that would provide transplants to incarcerated individuals, the facts do not allow the plausible inference that Defendants were acting in concert or shared a conspiratorial object. *See McCauley v. City of Chi.,* 671 F.3d 611, 616 (7th Cir. 2011) ("legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to [a] presumption of truth"). Rather, it appears Plaintiff is pleading that Defendants' involvement in Parks' care was more independent in nature and that the lack of communication and coordination between Parks' treatment team at Big Muddy contributed to Parks' deficient treatment. (*See* Doc. 1, p. 13). Because there are no "factual allegations [tying] the defendants to a conspiracy," Count 3 is dismissed as insufficiently pled. *See Cooney v. Rossiter,* 583 F. 3d 967, 971 (7th Cir. 2009).

---

[4] Plaintiff responded to Defendant Isaacs' arguments seeking the dismissal of the conspiracy claim (Count 3) but did not respond to the arguments submitted by Defendants Dr. Babich, Dr. Larson, and NP Menees. (*See* Doc. 23; Doc. 45).

**e.  State Law Claims – Defendants Wexford, Dr. Babich, Dr. Larson, and NP Menees (Counts 5, 6, and 9)**

Defendants Wexford, Dr. Babich, Dr. Larson, and NP Menees argue that Plaintiff has not sufficiently pled negligence, wrongful death, and survival action claims under Illinois state law. (Doc. 23, p. 15). They state that Plaintiff has failed to show that (1) Defendants had a duty to ensure Plaintiff received an organ transplant; (2) Defendants breached their duty by failing to provide care within the standard of care considering their scopes of practice; and (3) any action by Defendants caused Parks harm. (*Id.*). Specifically, as to Dr. Babich, Defendants argue that Plaintiff has not plead facts establishing a provider-patient relationship between Parks and Dr. Babich. (*Id.* at p. 16).

"To sustain an action for medical negligence, plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes,* 739 N.E.2d 496, 502 (Ill. 2000). To recover damages for the harm to Parks by medical negligence, Plaintiff has brought a claim under the Survival Act, which "preserves causes of action on behalf of decedents that would otherwise be rendered moot upon the death of the decedent." *Rodgers v. Cook Cnty.,* 998 N.E.2d 164, 172 (Ill. App. Ct. 2013). The Wrongful Death Act, on the other hand, provides an independent cause of action for damages arising from a decedent's death caused by a wrongful act, neglect, or default. *See* 740 Ill. Comp. Stat. 180/1.

Unlike Illinois law, under the federal pleading standards, Plaintiff does not have to plead facts to "satisfy each element of a claim." *Heffman v. Bass,* 467 F. 3d 596, 599 (7th Cir. 2006) (discussing the differences between the pleading requirements under Illinois state law and federal

law). *See also; Chapman v. Yellow Cab Co.*, 875 F.3d 846, 848 (7th Cir. 2017) ("Ever since their adoption in 1938, the Federal Rules of Civil Procedure have required plaintiffs to plead claims rather than facts corresponding to the elements of a legal theory."). All that is required is "notice." *Wilson v. Ryker,* 451 F. App'x 588, 590 (7th Cir. 2011) ("Notice is what counts"). Again, Plaintiff has met this burden.

Plaintiff's negligence and wrongful death claims are based on the alleged indifference and/or negligent conduct of Defendants for failing to provide Parks "proper medical care or access to medical care." (Doc. 1, p. 11). Such conduct included, but is not limited to, failing to manage Parks' medication and medical diagnosed conditions and supervise him while off the medication; failing to send Parks to hospitals that they knew would facilitate a liver transplant; refusing to give Parks' medication; failing to appropriately and timely evaluate Parks for signs of liver failure and cirrhosis; and failing to timely and appropriately respond to Parks' physical state of pain and suffering. (*Id.* at p. 17). These allegations are sufficient to establish that a duty of care existed between Parks and the Defendants, all who arguably treated him in various capacities at Big Muddy, based on a physician-patient relationship and that those individuals breached that duty in willful disregard of his condition, ultimately leading to his death. "[T]he specific standard of care, and whether that standard was breached, is a fact question to be resolved at a later stage." *Dangerfield,* 2024 WL 2873809, at *7 (quoting *Sonntag v. Cook Cty., Ill.*, No. 21 C 4935, 2022 WL 704833, at *5 (N.D. Ill. Mar. 9, 2022)). Counts 5, 6, and 9 will not be dismissed against Wexford, Dr. Babich, Dr. Larson, and NP Menees.

### f.   *Respondeat Superior* **Claim – Defendant Wexford (Count 10)**

The Motion to Dismiss is granted as to Count 10. As this Court has previously held, "the Seventh Circuit's decision in *Iskander* squarely precludes [Plaintiff] from bringing a *respondeat*

*superior* claim against Wexford under Section 1983." *Reed v. Wexford Health Sources, Inc.,* No. 20-cv-1139-SPM, 2021 WL 673370, at *2 (S.D. Ill. Feb. 22, 2021) (quoting *Hernandez v. Ill. Dep't of Corr.*, No. 17-cv-1335-NJR-RJD, 2019 WL 3059796, at *3 (S.D. Ill. July 12, 2019)). *See also Green v. Meeks*, No. 20-cv-463-NJR, 2020 WL 5292045, at *3 (S.D. Ill. Sept. 4, 2020); *Lowe v. Williams*, No. 16-c-8274, 2020 WL 5848439, at *7 (N.D. Ill. Oct. 1, 2020); *Pindak v. Dart,* 125 F. Supp. 3d 720, 765 (N.D. Ill. 2015). Although the Seventh Circuit continues to "cast doubt on its reasoning in *Iskander*[,]…this Court is obligated to follow the decisions of higher courts" until the question is resolved. *Hernandez,* 2019 WL 3059796, at *3. As the existing law in this circuit currently prohibits *respondeat superior* liability in Section 1983 actions, the Motion to Dismiss is granted as to Plaintiff's *respondeat superior* claim under federal law. *See Howell v. Wexford Health Sources, Inc.*, No. 19-3210, 2021 WL 405006, at *3 (7th Cir. Feb. 5, 2021) (holding that "[c]ircuit precedent establishes at this time that private corporations acting under color of law also benefit from *Monell's* rejection of *respondeat superior* liability for an employee's constitutional violations"); *Peterson v. Wexford Health Sources, Inc.,* 986 F. 3d 746, 754 (7th Cir. 2021) (stating that "[d]espite calls to reconsider our precedent, we have chosen to leave Iskander undisturbed") (internal citations and quotations omitted).

The Court also dismisses Count 10 as to Plaintiff's allegations of *respondeat superior* liability under Illinois State law. As Defendants argue and this Court has observed, "*respondeat superior* is not a separate claim, but a theory of liability. The state law of *respondeat superior* is therefore improperly pled as a separate count and is dismissed." *Dangerfield,* 2024 WL 2873809, at *7 (internal quotations and citations omitted). *See Armbruster v. Wexford Health Sources, Inc.,* 16-cv-544-MRJ, 2017 WL 2619032, at *3 (S.D. Ill. June 16, 2017)). *See also Wilson v. Edward Hosp.,* 981 N.E. 2d 971 (Ill. 2012). "Nonetheless, Plaintiff may argue *respondeat superior* as a

theory of her claims against Wexford under the Illinois Wrongful Death Act and Survival Act, Counts [6 and 9], for the acts and omissions of its employees." *Wiley v. Young,* No. 21-cv-599-JPG, 2022 WL 488144, at *8 (S.D. Ill. Feb. 17, 2022).

## DISPOSITION

For the reasons stated above, the Motion to Dismiss filed by Defendants Wexford Health Sources, Inc., Dr. Larson, NP Menees, and Dr. Babich is **GRANTED in part** and **DENIED in part.** (Doc. 23). The Motion to Dismiss filed by Defendants IDOC and Isaacs is **GRANTED in part** and **DENIED in part.** (Doc. 38). **COUNTS 3, 7, 8,** and **10** are dismissed in their entirety. **COUNTS 5, 6**, and **9** are dismissed as to Defendant Isaacs. As there are currently no surviving claims against IDOC, the Clerk of Court shall **TERMINATE** IDOC as a party on the docket. Plaintiff is proceeding with the following Counts:

| | |
|---|---|
| **Count 1:** | Eighth Amendment deliberate indifference claim against Babich, Isaacs, Larson, and Menees. |
| **Count 2:** | Eighth Amendment deliberate indifference (*Monell*) claim against Wexford. |
| **Count 4:** | Eighth Amendment failure to intervene claim against Babich, Isaacs, Larson, and Menees. |
| **Count 5:** | State law negligence claim against Wexford, Babich, Larson, and Menees. |
| **Count 6:** | State law wrongful death claim against Wexford, Babich, Larson, and Menees. |
| **Count 9:** | Illinois Survival Act claim against Wexford, Babich, Larson, and Menees. |

**IT IS SO ORDERED.**

**DATED: March 13, 2026**

   *s/Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**United States District Judge**